**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**ARROWHEAD ROAD SERVICES, LLC**
P.O. Box 555
Rosedale, Virginia 24280,

*Plaintiff,*

v.

**ERIC VENDEL, IN HIS OFFICIAL CAPACITY AS CHIEF OF THE OHIO DEPARTMENT OF NATURAL RESOURCES'S DIVISION OF OIL AND GAS RESOURCES MANAGEMENT**
2045 Morse Road, Building F-2
Columbus, Ohio 43229

and

**ANDREW ADGATE, IN HIS OFFICIAL CAPACITY AS AN OFFICER, EMPLOYEE, OR AGENT OF THE OHIO DEPARTMENT OF NATURAL RESOURCES'S DIVISION OF OIL AND GAS RESOURCES MANAGEMENT**
2045 Morse Road, Building F 2
Columbus, Ohio 43229

and

**JOHN DOES 1–3, IN THEIR OFFICIAL CAPACITIES AS OFFICERS, EMPLOYEES, AND/OR AGENTS OF THE OHIO DEPARTMENT OF NATURAL RESOURCES'S DIVISION OF OIL AND GAS RESOURCES MANAGEMENT**

*Defendants.*

Case No. 2:26-cv-01563

Judge: ____________________

Magistrate Judge: ____________________

# VERIFIED COMPLAINT

Plaintiff Arrowhead Road Services, LLC ("Arrowhead"), for its Complaint against Defendants Eric Vendel, in his official capacity as Chief of the Ohio Department of Natural Resources' Division of Oil and Gas Resources Management ("Chief Vendel" or the "Chief"), Andrew Adgate, in his official capacity as an officer, employee, or agent of Ohio Department of Natural Resources' Division of Oil and Gas Resources Management ("Adgate") and John Does 1–3 (collectively, "Defendants"), alleges as follows:

## NATURE OF THE CASE

1. This is an action for preliminary and permanent injunctive relief under 42 U.S.C. § 1983 from Defendants' violations of Arrowhead's constitutional rights under the First Amendment and Fourteenth Amendment of the United States Constitution, and for declaratory relief under 28 U.S.C. §§ 2201-2202.

## PARTIES

2. Plaintiff Arrowhead Road Services, LLC is a limited liability company that owns and operates Arrowhead Road Services #1 (SWIW #27), API No. 34-167-2-9771-00-00 (the "Well"), a Class II injection well located in Belpre Township, Washington County, Ohio.

3. Defendant Eric Vendel is the Chief of the Division of Oil and Gas Resources Management (the "Division") of the Ohio Department of Natural Resources ("ODNR"). He is responsible for issuing the Suspension Order and for administering and enforcing Ohio's Class II injection-well program. He is sued in his official capacity for declaratory and prospective injunctive relief from his violation of Arrowhead's constitutional rights.

4. Defendant Andrew Adgate is an administrator for the Division of ODNR, and as such is an officer, employee, or agent of the Division. He is sued in his official capacity for

declaratory and prospective injunctive relief from his violation of Arrowhead's constitutional rights.

5. Defendants John Does 1–3 are officers, employees, or agents of the Division who participated in, or took direct action to effect, the Division's conduct underlying the violations of Arrowhead's constitutional rights. They are sued in their official capacities for declaratory and prospective relief. Arrowhead will amend its Verified Complaint to identify them after obtaining discovery.

## JURISDICTION AND VENUE

6. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

7. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3), and 28 U.S.C. § 2201.

8. Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTS COMMON TO ALL CLAIMS

### A. ARROWHEAD'S SAFE OPERATION OF A CLASS II INJECTION WELL FACILITY IN COMPLIANCE WITH OHIO LAW.

9. Arrowhead, a locally-operated oil-and-gas services company specializing in the disposal, and tracking of flowback and produced fluids, employs Ohio residents, serves Ohio oil-and-gas producers, and has been the highest-volume disposal well in Ohio for multiple consecutive years.

10. Arrowhead's business began the process of operating a disposal well on or about October 2, 2020, when it obtained a permit from the Division to drill a Class II injection well—

Arrowhead Road Services LLC No. 1 Well, API #34-167-2-9771-00-00, (the "Well")—in Belpre Township, Ohio.

11. Since 2020 Arrowhead has invested $6 million in the construction, operation, and maintenance of the Well, complying with every requirement of Ohio law. With that investment, Arrowhead built a state-of-the-art facility designed to receive and inject up to approximately 12,000 barrels of brine per day and to accommodate scheduled outages of a specific producer's blended-water site requiring between 10,000 and 12,000 barrels per day.

12. To operate a Class II injection well, companies must first obtain a permit from the chief of the Division of ODNR. The Chief issues such permits pursuant to his authority under Ohio Revised Code ("O.R.C.") 1509.22(D). O.R.C. 1509.22 also grants the Chief broad rulemaking authority in relation to the operation of Class II wells under such permits.

13. Pursuant to his statutory authority, the Chief issued Arrowhead a permit on April 22, 2022, authorizing Arrowhead to operate the Well as a Class II injection well. The conditions of the permit established a maximum allowable injection pressure ("MAIP") of 990 pounds per square inch, calculated under Ohio Admin. Code 1501:9-3-07(C)(1). A true and accurate copy of Order No. 2022-100 is attached hereto as Ex. 1 (the "Operating Order" or "Permit").

14. In over four years of operation, Arrowhead has operated the Well pursuant to the Permit without incident, safely injecting brine into its permitted injection zone without a single public-health, safety, or environmental incident.

15. Arrowhead has had zero public-health, safety, or environmental incidents attributable to the Well. Zero evidence of communication with producing wells. Zero evidence of injected water leaving the permitted injection interval. Zero evidence of the presence of any contaminant in groundwater within the Well's area of review.

16. Despite Arrowhead's track record, the Chief attempted to arbitrarily revoke Arrowhead's Permit.

### B. The Chief Unlawfully Attempted to Revoke Arrowhead's Permit—And Was Reversed.

17. On October 24, 2024, the Chief issued Order No. 2024-470, requiring Arrowhead to conduct a step-rate test and provide the Division with the underlying real-time pressure and volume data. Arrowhead complied and submitted the required data to the Division on June 10, 2025. A true and accurate copy of Order No. 2024-470 is attached hereto as Ex. 2.

18. On September 5, 2025, the Chief issued Order No. 2025-360 (the "Preliminary Revocation Order"). A true and accurate copy of the Preliminary Revocation Order is attached hereto as Ex. 3.

19. The Preliminary Revocation Order found in relevant part that: (i) the MAIP in the injection zone must be set below fracture closure pressure to minimize potential impacts to the surface, underground sources of drinking water, and other horizons; (ii) based on a calculation of the estimated fracture closure pressure using the recently completed step-rate test, the MAIP previously authorized by the Division for the Well exceeded that calculated pressure; and (iii) based on the estimated fracture closure pressure and an applied safety factor of 10%, the Well's MAIP should be set at 120 psi. (*See* Ex. 3, Findings at ¶¶ 1–3.)

20. Based upon these findings, the Chief concluded that Arrowhead's Permit should be revoked. (*See id.*, Orders at ¶ 1.)

21. The Chief relied upon three pieces of purported evidence to make these findings in support of revoking Arrowhead's Permit. (*See id.*, Background.)

22. First, the Chief cited an analysis of Arrowhead's step-rate test data, prepared by Sean Murphy ("Murphy"), a petroleum engineer retained by the Division. Murphy calculated an

average fracture closure pressure of 131 psi for the Arrowhead Well—a pressure well below the 990 psi MAIP authorized by the Operating Order. (*See id.* at ¶¶ 8, 13–15.)

23. Second, the Chief asserted that "Injection at a pressure above the fracture closure pressure can cause fractures to open and expand, which creates risk that injected fluid will travel out of the injection zone." (*Id.* at ¶ 16.)

24. Third, the Chief cited a report prepared in 2020 by Resource Services International, Inc. (the "Redbird Report"), which the Division had commissioned in connection with a different injection well in Washington County. (*Id.* at ¶¶ 17–18.)

25. The Redbird Report concluded that injected fluid from that well had expanded existing natural fractures in the Ohio Shale, that well's injection zone at that time, and migrated to the surface through production wells located more than five miles away. A true and accurate copy of the Redbird Report is attached hereto as Ex. 4.

26. The Preliminary Revocation Order did not identify a single piece of evidence that any brine injected by Arrowhead had migrated outside the permitted injection zone or area of review. (*See* Ex. 3, Background.)

27. The Chief's assertion regarding the effects of injecting above the estimated fracture closure pressure did not cite any scientific evidence in support of the proposition. (*Id.* at ¶ 16.)

28. Furthermore, neither O.R.C. Chapter 1509 nor Ohio Administrative Code Chapter 1501:9-3—the governing statute and rules for all aspects of Class II injection wells—contain any reference to the term "fracture closure pressure," much less any requirements related thereto.

29. Nevertheless, the Chief—purporting to act under O.R.C. 1509.03, 1509.22, and 1509.224—issued the Preliminary Revocation Order, seeking to revoke Arrowhead's Permit that it had safely operated under for over three years and imposed a drastically reduced MAIP of only

120 psi—a reduction that threatened to cripple Arrowhead's commercial viability. (*See* Ex. 3.)

30. The Preliminary Revocation Order, however, also notified Arrowhead of its procedural process—specifically, that the order would become a final one in thirty days unless Arrowhead requested an informal hearing during that time, and, that as a preliminary order, it was "not effective until it be[came] final." (*See* Ex. 3, Orders at ¶ 1.)

31. Arrowhead timely requested an informal hearing on September 17, 2025, which the Division held on October 30, 2025.

32. Following the informal hearing, on December 10, 2025, the Chief issued Order No. 2025-512 (the "Revocation Order"). A true and accurate copy of the Revocation Order is attached hereto as Ex. 5.

33. Relying on principally the same information as the Preliminary Revocation Order, the Revocation Order revoked Arrowhead's Permit and set new operational conditions for Arrowhead to resume operations. (*See* Ex. 5, Orders at ¶¶ 1–2(i).)

34. Arrowhead exercised its constitutional right to petition the Commission for post-deprivation relief by appealing the Revocation Order in Commission Appeal No. 1067. Arrowhead argued, among other things, that the Chief lacked authority to revoke the Operating Order, disregarded the Division's own MAIP regulation, attempted to impose an uncodified pressure standard, and acted without evidence that brine had migrated from the permitted injection zone or area of review.

35. On August 11, 2026, the Commission heard oral argument on Arrowhead's motion for judgment as a matter of law. A true and accurate copy of the pertinent pages from the transcript of the Oral Argument on Motion for Judgment as a Matter of Law in Appeal No. 1067 are attached hereto as Ex. 6.

36. During that hearing, the Division—arguing that it was not required to show that contamination had actually occurred—implicitly acknowledged that it had not identified actual contamination caused by Arrowhead. (Ex. 6, 12:23–13:15.)

37. Chair Shepard-Desai of the Commission questioned the Division about the fracture closure pressure standard—the Chief's principal basis for the Revocation Order—asking why it was not incorporated into the rule or governing formula if it was a concern. (*Id.*, 35:16–36:18.)

38. Commissioner Aslanides and Chair Shepard-Desai noted during an exchange with the Division that a fracture would have to go through 400 feet of limestone, through the shale, and through whatever other formation was producing in proximity in order for injected fluid to migrate beyond the Well's area of review. (*Id.*, 42:18–43:17.)

39. During the same exchange, the Division acknowledged that it could not identify specific nearby production wells that it was concerned about in connection with Arrowhead's Well. (*Id.*)

40. Following oral argument and a period of quasi-judicial deliberation, the Commission voted unanimously to grant Arrowhead's Motion for Judgment as a Matter of Law. (*Id.*, 53:21–55:3.)

41. The Chair of the Commission announced that a written decision would follow within two weeks. (*Id.*, 55:2–55:6.)

42. On September 3, 2026, the Commission entered its written order vacating the Revocation Order, finding that the Chief—by revoking Arrowhead's Operating Order without the necessary legal authority and factual foundation—had acted unlawfully and unreasonably. A true and accurate copy of the Final Order of the Commission Vacating Chief's Order 2025-512 is attached hereto as Ex. 7.

43. More specifically, after reviewing each statutory provision cited by the Chief in the Revocation Order—O.R.C. 1509.03(D), 1509.04(A), 1509.06(F), 1509.22(A), and 1509.22(D)(3)—the Commission found that none of them conferred the Chief with the authority to revoke an already-existing, actively-operated permit. (Ex. 7 at § I(a).)

44. The Commission also found the following:

a. O.R.C. 1509.22(A)—which prohibits contamination—could not support the Revocation Order because the order contained no allegation or finding that Arrowhead had actually placed brine or other contaminants in groundwater, on land, or in surface water. (*Id.*)

b. The Chief lacked the implied authority to revoke Arrowhead's Operating Order, as that authority only exists where a permittee had willfully engaged in an egregious violation of O.R.C. Chapter 1509. (*Id.* at § I(b).)

c. The Revocation Order contained no allegation or finding that Arrowhead had violated any provision of O.R.C. Chapter 1509, egregiously or otherwise. (*Id.*)

d. The Chief does not have unqualified authority—not under O.R.C. 1509.22, nor any other section of O.R.C. Ch. 1509. (*Id.* at § I(c).)

e. Neither of the two pieces of evidence upon which the Chief relied—the Redbird Report and Murphy's analysis of the Arrowhead step-rate test—established a willful and egregious violation of O.R.C. Chapter 1509 by Arrowhead. (*Id.* at § II.)

f. The Redbird Report concerned a well that Arrowhead neither owned nor operated and did not mention Arrowhead's operations at all. (*Id.*)

g. The step-rate test analysis failed to identify any violation by Arrowhead and that fracture of the injection formation alone is not a violation of O.R.C. Chapter 1509. (*Id.*)

h. The Chief's use of a new method for calculating MAIP—based on an estimated fracture closure pressure—without following the mandatory rulemaking process under O.R.C. Ch. 119 was contrary to the requirements of O.R.C. 1509.03(A) and O.R.C. 1509.22(D)(1). (*Id.* at § IV.)

i. The Chief acted contrary to the requirements of Ohio Admin. Code 1501:9-3-07(C)(1) by failing to derive the MAIP exclusively from the prescribed formula, and to the extent the Division was concerned the Chief would have to wait for disaster before acting, the Chief's own suspension authority under Ohio Admin. Code 1501:9-3-07(N)(1)(a) and (N)(1)(f) offered a path to prevent such an occurrence. (*Id.* at § V.)

45. On September 18, 2026, the Chief appealed the Commission's order to the Franklin County Court of Common Pleas. However, apparently unsatisfied with the result of the Commission's decision, the Chief took further action.

### C. IN THE WAKE OF ARROWHEAD'S VICTORY, THE DIVISION CHANGED ITS PRACTICES TOWARDS ARROWHEAD.

46. Since Arrowhead began Well operations, it had never previously received a compliance notice.

47. On August 31, 2026—while the parties awaited the Commission's written decision granting Arrowhead's motion—Division inspector Jon Scott conducted an inspection at Arrowhead's facility and issued two compliance notices addressing minor or technical conditions.

48. Mr. Scott was not the Division inspector who ordinarily inspected Arrowhead's

Well, and who has never inspected Arrowhead's injection-operations facility since the site opened for injection.

49. The first notice concerned the labeling of a single brine truck operated by Gas Field Services, LLC, a transporter serving Arrowhead's facility, which the notice stated was not labeled with the transporter's UIC number, the word "brine," and the company's phone number as required by O.R.C. 1509.223(D).

50. The second notice stated that an obstruction in a one-quarter-inch annulus valve and corrosion on the threads of a one-quarter-inch injection-pressure valve prevented installation of state-issued pressure gauges.

51. Approximately two weeks before Mr. Scott's inspection, however, the Division's regular inspector had conducted a mechanical-integrity test at the Well—using the same valves at issue in the second notice—without raising concerns about either valve's condition.

52. The compliance notices identified August 31, 2026 as the date of issuance and directed Arrowhead to complete corrective action by September 14, 2026. But the notices were not printed until September 11, 2026, not accepted by the United States Postal Service until September 12, 2026, and not received by Arrowhead until September 24, 2026—ten days after the stated correction deadline.

53. Arrowhead acted immediately upon receiving the notices: Arrowhead replaced the identified valves that afternoon and the truck was relabeled the next morning.

54. Arrowhead sent photographs documenting the corrective work to Mr. Scott and the Division's regular inspector.

55. On September 30, 2026, Arrowhead's counsel wrote to the Division's counsel noting Arrowhead's compliance with the untimely notices, and explaining that the timing, choice

of inspector, and minor nature of the notices created the appearance of retaliation for Arrowhead's successful appeal before the Commission. Arrowhead expressly invoked its First and Fourteenth Amendment rights and warned that the Division could not respond to Arrowhead's protected petitioning activity in a manner that would chill future exercise of those rights. A true and accurate copy of the September 30, 2026 Arrowhead letter is attached hereto as Ex. 8.

56. On October 7, 2026, the Division's counsel responded. Counsel denied retaliation, acknowledged that Arrowhead received the notices after the stated correction date, and represented that Arrowhead would not be penalized for completing corrective action after that date. Counsel also stated that compliance notices generally do not result in further action if the cited conditions are addressed. A true and accurate copy of the October 7, 2026 Division response letter is attached hereto as Ex. 9.

57. The October 7 response did not acknowledge that, two days earlier, the Division had already informed Arrowhead of its intention to issue a suspension order against Arrowhead.

### D. The Division Decided to Suspend Arrowhead Without Explanation.

58. On October 5, 2026—five days after Arrowhead raised its retaliation concerns—ODNR attorney Halli Brownfield Watson ("Ms. Watson") emailed Arrowhead's counsel and stated: "The Division has become increasingly concerned with the operation of that well and intends to issue a suspension order." The Division offered a meeting to "discuss [its] concerns before issuing the order." A true and accurate copy of the email correspondence between Parties' counsel is attached hereto as Ex. 10.

59. Only in following correspondence—on Thursday, October 8, 2026—did Ms. Watson reveal that the Division would issue the suspension order by the end of the following week, leaving Arrowhead with four possible days to meet with the Division before the order issued. (Ex. 10.)

60. And only upon Arrowhead's counsel's response asking for the factual and legal bases underlying the Chief's decision, did Ms. Watson on Friday, October 9, 2026 state, "The Division has concerns about injected brine migrating out of the permitted injection zone and area of review." (*Id.*)

61. Ms. Watson did not provide any further factual or legal bases upon which the Chief had made his determination, but, instead, she suggested that Arrowhead could defer deciding whether to meet "until the order is issued". (*Id.*)

62. Arrowhead attended a call with the Division on October 14, 2026 on Microsoft Teams for approximately eleven minutes. During the brief call, the Division did not provide Arrowhead the specific bases underlying the Chief's decision. The Division also failed to disclose any details regarding the order to suspend Arrowhead's operations, including whether it would be a preliminary order, or that it would be immediately effective.

**E. THE CHIEF ISSUED AN IMMEDIATE AND INDEFINITE SUSPENSION ORDER.**

63. On October 16, 2026, Ms. Abby McMahon communicated that the Chief issued Order No. 2026-278 (the "Suspension Order")—a "preliminary order"—suspending operation of the Well. (Ex. 10.) Defendant Andrew Adgate signed the Suspension Order on behalf of the Chief. A true and accurate copy of Order No. 2026-278 is attached hereto as Ex. 11.

64. Despite being a preliminary order—which under O.R.C. 1509.224(B) sets forth the Chief's ***proposed*** action and provides the operator subject to the order thirty days to request an informal hearing before it becomes a "final order"—the Chief made the Suspension Order immediately effective. (Ex. 11.)

65. Arrowhead's counsel responded acknowledging receipt of the Suspension Order, and, noting that it was a preliminary order, informed the Division's counsel that it intended to continue operations unless the Division disagreed that Arrowhead was permitted to do so. Ms.

Watson's response: "The Division disagrees. The Order is clear that it is immediately effective." (Ex. 10.)

66. Arrowhead's counsel then asked Ms. Watson to provide the specific statutory authority that permitted the Chief to issue an immediately effective order; she refused, stating "The statute speaks for itself. If your client does not intend to comply with the immediately effective suspension, please advise."

67. Arrowhead, not wanting to risk potential civil and criminal liabilities under O.R.C. 1509.33 and O.R.C. 1509.99, submitted and has complied by temporarily suspending operations despite disputing the Suspension Order's lawfulness.

**F. THE SUSPENSION ORDER**

68. The legal bases for the Suspension Order that the Chief cites are O.R.C. 1509.12(A)(1) and Ohio Adm. Code 1501:9-3-07(N)(1). (Ex. 11, Background at ¶¶ 15–16.)

69. O.R.C. 1509.12(A)(1) provides that "[n]o person shall construct or operate a well, . . . that threatens the public health and safety or the environment." (*Id.*)

70. Ohio Adm. Code 1501:9-3-07(N)(1), in relevant part, provides that "[t]he chief may immediately suspend, by order, operations of a class II disposal well or surface facility under any of the following circumstances: (a) A class II disposal well is causing or is likely to cause contamination of the land, surface waters, or subsurface waters; . . . (f) The chief determines that operation or continued operation of the well or surface facility is likely to endanger public health or safety; (g) The chief determines that brine or other waste substances from class II disposal well injection operations may be outside of the permitted injection zone or area of review; . . . [and] (k) Any violation of Chapter 1509. of the Revised Code or division 1501:9 of the Administrative Code." (*Id.*)

71. The Chief, through his Suspension Order, makes the following findings: (i) the

operation of the Well threatens the public health and safety and the environment; (ii) the operation of the Well is likely to cause contamination of the land, surface waters, or subsurface waters; and (iii) brine or other waste substances from operation of the Well may be outside of the area of review and permitted injection zone; and (iv) the Arrowhead Well should be immediately suspended. (*See* Ex. 11, Findings at ¶¶ 1–4.)

72. The Suspension Order does not identify a single piece of Arrowhead-specific evidence establishing that brine injected by Arrowhead has migrated outside the permitted injection zone or area of review. It fails to identify any contamination caused by Arrowhead, including of any production well. It does not identify any actual or imminent danger to public health or safety caused by Arrowhead. It fails to identify any fracture, wellbore, penetration, conduit, or pathway through which Arrowhead's brine has migrated or is likely to migrate. (*See* Ex. 11.)

73. Instead, the Suspension Order relies on the following: (i) the Redbird Report—the same report addressed by the Commission—concluding that injection fluid from a different well in Washington County owned and operated by a different company expanded existing natural fractures in the ***Ohio shale***, a different formation, and found its way to surface through production wells over five miles away; (ii) Murphy's August 12, 2025 analysis of Arrowhead's step-rate test data, purporting to establish an average fracture closure pressure of 131 psi, which is below the 990 psi MAIP authorized by the Operating Order; (iii) the ***voluntary*** suspension of the unrelated Redbird No. 4 and No. 5 Wells on June 30, 2026, after the Division "concluded" that fluid injected into the Bass Island Dolomite by those wells had migrated to production wells up to four miles away; and (iv) the proximity of four water production wells operated by Little Hocking Water Association, Inc. ("Little Hocking"), located approximately one mile from the Well. (*See id.*,

Background at ¶¶ 1–14.)

74. The Suspension Order and the orders seeking to revoke Arrowhead's Permit share much of the same factual core. (*Compare* the Suspension Order (Ex. 11) *with* the Preliminary Revocation Order and Revocation Order (Exs. 3 and 5).)

75. Both rely on the same Murphy report, dated August 12, 2025, and the same conclusions drawn from it—that the average estimated fracture closure pressure is 131 psi and that the existing 990 psi MAIP exceeds that estimate. (*See id.*)

76. Both rely on the same assertion that injections at pressures above the fracture closure pressure can cause existing fractures to open and expand, creating a risk that injected fluid will travel outside the injection zone. (*See id.*)

77. And both rely on the same Redbird Report and its conclusions that injected fluid from a different Washington County well, that was injected into a different formation than Arrowhead's Well, expanded existing natural fractures and migrated to the surface through production wells more than five miles away. (*See id.*)

78. Unlike the Preliminary Revocation Order, however, the Chief issued the Suspension Order—which also purports to be preliminary—stating that "[t]his Order is immediately effective." (*Id.*)

79. While the Preliminary Revocation Order provided Arrowhead thirty days after receiving notice of the order to request an informal hearing prior to the order becoming final, the Suspension Order does not.

80. The purported facts upon which the Chief relies to suspend Arrowhead's Permit are insufficient to establish that Arrowhead's Well caused, or is even likely to cause, any of the conditions invoked in the Suspension Order, or otherwise violate any provision of O.R.C. Chapter

1509. The Chief and the Division, however, did not provide Arrowhead a meaningful opportunity to address these purported facts prior to the Chief issuing, and Adgate signing, the order.

81. As the Chief was well-aware when he issued the Suspension Order, which Adgate signed, the Commission had already noted its issues with the Chief's reliance on these facts with respect to the Revocation Order and had held the Revocation Order unlawful.

82. Only two categories of information in the Suspension Order's Background were new: the Redbird-related information and Little Hocking's production well information.

83. Arrowhead was not permitted a meaningful opportunity to challenge the Chief's decision to issue the Suspension Order that rests on the same factual foundation the Commission had unanimously found insufficient to support the Revocation Order—including the same Murphy report, the same Redbird Report, and the same assertion that injection above fracture closure pressure creates a risk of fluid migration.

84. Arrowhead was not permitted a meaningful opportunity to show that the voluntary suspension of the Redbird No. 4 and No. 5 wells does not support the Suspension Order. First, Arrowhead did not get to question how Redbird's decision to voluntarily suspend its operations validates the Chief's conclusions regarding the Redbird wells. Further, Arrowhead was unable to discuss whether any conclusion the Chief arrived at regarding those wells' operations are related to Arrowhead's Well, and, to the extent the Chief believes them interrelated, Arrowhead did not have a meaningful opportunity to rebut that belief.

85. The Chief has not identified any shared formation characteristics, operating conditions, pressure data, or migration pathway that would make the Redbird wells' circumstances applicable to Arrowhead. Nor does the Chief explain how the Redbird Report is applicable to Arrowhead when the wells reviewed in the Redbird Report injected their disposal water into Ohio

Shale, an injection point Arrowhead has never used. Furthermore, the reliability of the Redbird Report and its conclusions may be disputed.

86. The only evidence the Chief provides of the wells' relationship is that they *now* inject into the same formation and are approximately 3.5 miles apart, but does not discuss geological features of the formation, or address how that distance supports any of the Suspension Order's findings. (*See* Ex. 11.)

87. Arrowhead was not permitted a meaningful opportunity to discuss the Division's knowledge of at least one other injection well in the relevant area—the Nichols No. 1-A Well (SWIW #13)—that has recent and historical casing problems that could account for the regional production-well conditions the Chief attributed to Arrowhead in the Suspension Order. Arrowhead did not have a meaningful opportunity to address this potential alternative source that could have caused any conditions concerning the Chief. No public record known to Arrowhead establishes that the Division investigated or ruled out the Nichols No. 1-A Well as a potential source of the regional conditions cited in the Suspension Order before issuing the order against Arrowhead.

88. Arrowhead was not permitted a meaningful opportunity to show that the proximity of Little Hocking's production water wells does not support the Suspension Order. The Suspension Order identifies those wells as located approximately one mile from the Well but does not identify any fracture, wellbore, penetration, conduit, or pathway through which brine injected into the Bass Island Dolomite could migrate to those much shallower water sources.

89. Had Arrowhead had a meaningful opportunity to be heard, it would have provided the Chief with Little Hocking's 2025 EPA Water Quality Report, issued in June 2026, which was sampled for fifty different contaminants—including Barium, a contaminant whose typical sources include discharge of drilling wastes—and found no violation related to Barium or any other

contaminant associated with drilling operations. A true and accurate copy of the Little Hocking 2025 EPA Water Quality Report is attached hereto as Ex. 12.

90. Further, between 2018 and 2025, the Barium level in Little Hocking's drinking water decreased from .108 ppm to .0765 ppm even though Arrowhead began operating its Well in 2022 with a MAIP of 990 psi. A true and accurate copy of the Little Hocking 2018 EPA Water Quality Report is attached hereto as Ex. 13.

91. Arrowhead was not permitted a meaningful opportunity to show that the Redbird Report does not support the Suspension Order. As the Commission pointed out, the Redbird Report concerned a well that Arrowhead neither owned nor operated and did not mention Arrowhead's operations at all. The report addressed migration from a different well, in a different, shallower formation, under different operating conditions. It does not identify any connection between its conclusions and the Well, does not analyze the Well's injection zone, and does not establish any pathway through which brine injected by Arrowhead could migrate outside the permitted injection zone or area of review.

92. Rather, the Redbird Report's conclusion that the water injected into the Ohio Shale through the Redbird wells had migrated, was apparently premised upon interpretations of specific datapoints: primarily injection pressure and injection volume. (Ex. 4 at p. 8–9.)

93. Ohio Admin. Code Rule 1501:9-3-07(G) requires Arrowhead to provide the Chief a quarterly report with "the following information: (i) Source, volume in barrels, and delivery date for each shipment of brine or other waste substances; (ii) Total volume in barrels of brine or other waste substances received for each month in the quarter; (iii) Summarized volumes of delivered brines or other waste substances separated by those subject to fee(s) pursuant to division (H) of section 1509.22 of the Revised Code; and (iv) Average and maximum injection pressures compiled

for each month of the previous quarter."

94. Ohio Admin. Code Rule 1501:9-3-07(H) further authorizes the Chief to "require a class II disposal well owner to submit additional information pertaining to the design, construction, ***or operation*** of the permitted class II disposal well . . . that the chief determines is necessary for the protection of public health or safety or to prevent damage to the environment or is necessary to ensure compliance with the requirements of this rule."

95. The Chief did not request any additional operational data from Arrowhead before issuing the Suspension Order. The Suspension Order does not cite or discuss Arrowhead's injection pressures, injection volumes, or any other operational data specific to the Well. (*See* Ex. 11.)

96. The Chief did not perform any analysis of the actual operating conditions of the Arrowhead Well—other than Murphy's step-rate test analysis the Commission held did not establish a violation of the Revised Code and was unlawful—before issuing the Suspension Order. (*See* Ex. 11; *see* also Ex. 7.)

97. But the Chief did not provide Arrowhead with a meaningful opportunity to discuss these incongruities before issuing the immediately effective Suspension Order.

98. Had the Chief and the Division provided Arrowhead with a scintilla of information regarding the factual and legal bases for the Chief's determination and decision and a meaningful opportunity to be heard, Arrowhead could have questioned the Chief and offered evidence that during the entire four and a half years of the Well's operations, the injection pressure readings have not revealed any indication of impairment of containment in the injection zone.

99. Without providing Arrowhead any meaningful opportunity to present any of this information, ask any of these questions, or rebut any of the purported bases for the suspension, the

Chief issued the Suspension Order, publicly announcing his determination that the operation of the Arrowhead Well threatens public health and safety, the environment, is likely to cause contamination of the land, surface waters or subsurface waters, and that brine or other waste substances may already be outside the area of review. (*See* Ex. 11, Findings at ¶¶ 1–3.)

100. The Chief ordered that "(1) ARS shall immediately suspend all operations at the Arrowhead Road Services # 1 Well;" "(2) ARS shall submit a plan in accordance with Ohio Adm.Code 1501:9-3-07(O)(1);" and "(3) Injection operations at the Arrowhead Road Services # 1 Well shall not resume until the Chief or his authorized representative determines that the conditions that caused the suspension have been corrected and this Order is terminated." (*See id.*, Background at ¶¶ 1–3.)

101. The Chief issued the Suspension Order pursuant to O.R.C. 1509.224(B) and declared it immediately effective. The Suspension Order sets forth Arrowhead's options to challenge the order. (*See id.*)

102. Arrowhead is permitted an informal hearing before the Chief—the same individual who denied Arrowhead any opportunity to be heard before issuing the Suspension Order—upon written notice within thirty days of the order's issuance. (*Id.*)

103. For reference, after the Chief issued the Preliminary Revocation Order, fifty-five days elapsed between its date of issuance and the informal hearing. Forty-one days elapsed between the informal hearing and the date the Chief issued the final order—the Revocation Order. When Arrowhead previously requested an informal hearing, it took ninety-six days—over three months—before the Chief made his preliminary order a final one. The Preliminary Revocation Order, however, was not effective until it became a final order. The Suspension Order is in effect.

104. The Suspension Order also provides that if no informal hearing is requested, it is

deemed final after thirty days. Only then, according to the Suspension Order, does it become appealable to the Commission. (*Id.*)

105. The Suspension Order does not set forth any other post-deprivation remedies, and none of the remedies it does offer are expedient or meaningful.

106. At bottom, the Division and the Defendants did not offer Arrowhead any meaningful opportunity because before they even informed Arrowhead of their intent to take action, they had already decided to suspend Arrowhead's operations, and nothing Arrowhead could have said or done would have changed that decision.

### G. THE DIVISION'S REGIONAL ENFORCEMENT HISTORY CONFIRMS ARROWHEAD'S DIFFERENT TREATMENT.

107. The Chief's Suspension Order is unlike any order he has previously issued suspending operations—it is immediately effective.

108. Every suspension order the Chief has issued since at least 2023—other than the Suspension Order issued to Arrowhead—was issued as a preliminary order. True and accurate copies of Chief's Order Nos. 2023-139, 2024-17, 2024-272, 2024-324, 2024-337, 2024-338, 2024-353, 2024-385, 2024-45, 2024-476, 2024-59, 2024-60, 2024-61, 2024-62, 2025-247, 2025-248, 2025-74, 2025-75, 2024-76, 2025-77, 2025-78, 2026-02, 2026-105, 2026-106, 2026-81, 2026-90 and 2024-469 are attached hereto as Ex. 14.

109. Each of those orders contains the following language, or language materially identical to it: "Pursuant to [O.]R.C. 1509.224(B), addressee is hereby notified that this action is a preliminary order that the Chief intends to issue as a final order. This preliminary order is not effective until it becomes final. This preliminary order becomes a final order 30 days after its issuance unless the person to whom the preliminary order is directed submits to the Chief a written request for an informal hearing before the Chief within that 30-day period."

110. Citing O.R.C. 1509.224(B), the Chief provided each of those operators thirty days to request an informal hearing before the Chief before the order became final and effective.

111. The Chief's Suspension Order issued to Arrowhead contains that same preliminary order language as set forth in Paragraph 109. It also contains an additional sentence that does not appear in any of the other orders: "This Order is immediately effective."

112. To its knowledge, Arrowhead is the only operator in the Chief's enforcement history to have received a preliminary suspension order declared immediately effective upon issuance.

113. Every operator subject to the orders in Ex. 14 is a Class II disposal well owner operating under a Division-issued permit—the same as Arrowhead.

114. Every order in Ex. 14 was issued pursuant to Ohio Admin. Code 1501:9-3-07(N)—the same provision invoked against Arrowhead.

115. The grounds invoked against those other operators were more specific and more serious than anything the Division has identified here. Twenty of the twenty-seven orders in Ex. 14 were issued because the operator could not demonstrate mechanical integrity—a documented, well-specific, measurable condition. None of those orders were immediately effective. (Ex. 14, Order Nos. 2024-17, 2024-45, 2024-59, 2024-60, 2024-61, 2024-62, 2024-324, 2024-337, 2024-338, 2024-353, 2024-476, 2025-74, 2025-75, 2024-76, 2025-77, 2025-78, 2025-247, 2025-248, 2026-02, and 2026-81.)

116. Two of the orders in Ex. 14 were issued because the operator's surface facility was actively releasing brine and other waste substances into the environment—documented, on-site contamination observed directly by Division inspectors. Neither of those orders was immediately effective. (Ex. 14, Order Nos. 2026-90 and 2026-105.)

117. One order in Ex. 14 was issued because the operator had accumulated two years of documented compliance failures across multiple follow-up inspections. That order was not immediately effective. (Ex. 14, Order No. 2024-272.)

118. One order in Ex. 14 was issued because the operator's automatic shut-off device was set above the maximum allowable surface injection pressure—a specific, documented violation observed directly by a Division inspector during an active inspection. That order was not immediately effective. (Ex. 14, Order No. 2024-469.)

119. One order in Ex. 14—Order No. 2023-139, issued to K&H Partners LLC ("K&H")—was issued under the same subsections invoked against Arrowhead: Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k). It was based on the same theory invoked against Arrowhead: that brine injected by the operator had migrated outside the permitted injection zone and area of review and was impacting nearby production wells. That order was not immediately effective. (Ex. 14, Order No. 2023-139.)

120. Unlike the Suspension Order issued to Arrowhead, the K&H order identified specific production wells that had been impacted, documented brine flows and pressure increases at those wells, and identified the geographic relationship between the injection wells and the impacted production wells. (Ex. 14, Order No. 2023-139.)

121. The Suspension Order the Chief issued to Arrowhead identifies none of those things. The Chief's Suspension Order fails to identify a single impacted production well, any documented brine flow or pressure increase attributable to Arrowhead, and no geographic or technical analysis connecting Arrowhead's operations to any identified condition.

122. Despite having less factual support than any other suspension order in Ex. 14, the Suspension Order issued to Arrowhead is the only one declared immediately effective.

123. There is no rational basis for that difference in treatment.

### H. Arrowhead Is Seeking Uncertain Relief Through An Administrative Appeal

124. Arrowhead filed an appeal of the Suspension Order to the Commission, challenging the lawfulness of the Suspension Order, on October 21, 2026, along with a motion for immediate partial judgment as a matter of law and an emergency motion for an immediate temporary stay.

125. O.R.C. 1509.36 provides in relevant part that "[a]ny person adversely affected" by an order of the Chief may file an appeal thereof. *Id.* The appeal does not automatically stay the order, and neither the statute, nor the relevant administrative code, requires the Commission to consider Arrowhead's requests for immediate relief expediently. *Id.*

126. Ohio Admin. Code Rule 1509-1-19(C) does however grant the Division ten days—until November 2, 2026—to respond to Arrowhead's motions.

127. To date, Arrowhead's appeal and motions remain pending, and the Commission has not issued a ruling or set a hearing on the motions.

### I. Arrowhead Has Been Irreparably Harmed.

128. Arrowhead has been and will continue to be irreparably harmed by the Suspension Order and by Defendants' conduct, which has violated and continues to violate Arrowhead's constitutional rights.

129. Arrowhead has operated the Well safely for over four and a half years without a single public-health, safety, or environmental incident. It has been Ohio's highest-volume disposal well for multiple consecutive years. Two major Ohio oil-and-gas producers selected Arrowhead as their preferred disposal facility. Through years of safe, lawful operation, Arrowhead has built a reputation as a reliable and responsible operator and established goodwill and trust with the citizens of Washington County and the Ohio oil-and-gas industry.

130. The deprivation of Arrowhead's constitutional rights is itself irreparable harm. The loss of constitutional rights—even for minimal periods of time—unquestionably constitutes irreparable injury. Defendants have violated Arrowhead's rights to procedural due process, substantive due process, equal protection, and freedom from retaliation for the exercise of its First Amendment right to petition the government. Those violations are ongoing. Every day the Suspension Order remains in effect is another day Arrowhead is deprived of its constitutionally protected property interests without adequate process, on the basis of evidence the Commission has already found insufficient, and in retaliation for having successfully exercised its constitutional right to appeal. That harm cannot be compensated by money damages after the fact.

131. The constitutional violations have also set in motion a chain of concrete, irreparable harms that compound with each passing day. The Suspension Order publicly declares—without citing any evidence specific to Arrowhead, its Well, or its operations that could reasonably support its findings—that Arrowhead's Well threatens public health and safety, is likely to cause contamination of land and water, and may have already caused brine to migrate outside the permitted injection zone. Arrowhead has no ability to control that message and no visibility into how the Suspension Order is being communicated to its customers, to regulators, or to the public.

132. That reputational harm is not hypothetical. Arrowhead's customers—Ohio oil-and-gas producers who depend on Arrowhead for the disposal of thousands of barrels of brine each day—are now on notice that the State of Ohio has determined that Arrowhead's Well poses a danger to the public and the environment. Those customers cannot wait for litigation to resolve that question. They must find alternative disposal facilities now. The Well is Arrowhead's only operating asset. Once those customers find alternatives, Arrowhead risks never recovering them—and will likely lose its business long before it has any opportunity to vindicate its rights through

legal process. The erosion of that goodwill and those customer relationships cannot be undone by a later judgment.

133. The physical harm to the Well compounds the injury further. An indefinite suspension of operations risks allowing suspended sediment to settle out and block porosity in the permeability pathways within the injection interval utilized by the Well. That physical impairment may persist even if the suspension is ultimately lifted, permanently jeopardizing the Well's commercial viability. A later award of money damages cannot restore a Well that has been physically compromised by an unlawful shutdown.

134. The suspension will also harm third parties who have come to rely on Arrowhead. The Ohio oil-and-gas producers that depend on Arrowhead for disposal of their brine will be forced to find alternatives and make costly alternative arrangements for planned outages. Approximately ninety Ohio-resident drivers employed by Gas Field Services LLC to haul produced and blended water to the Well will lose work. Those harms will ripple through the regional economy and cannot be recalled once they occur.

135. The suspension will also compel Arrowhead to eliminate or lay off its own employees—Ohio residents who depend on that work—before any court has had the opportunity to determine whether the Suspension Order is lawful.

136. Each of these injuries flows directly from Defendants' unconstitutional conduct. None of them can be adequately remedied by a later award of money damages. Many will be permanent. All of them are occurring now.

## CLAIMS FOR RELIEF

### COUNT I – Violation of Procedural Due Process Under 42 U.S.C. § 1983

137. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

138. The Fourteenth Amendment to the United States Constitution provides that no State shall deprive any person of life, liberty, or property without due process of law. A procedural due process claim under 42 U.S.C. § 1983, may be established by showing: (1) a right secured by the Constitution or laws of the United States; (2) a deprivation thereof; and (3) that the deprivation was caused by a person acting under color of state law without affording adequate procedural rights prior to the deprivation.

139. Arrowhead possesses constitutionally protected property interests of two distinct types. First, Arrowhead holds a leasehold property right to operate a Class II saltwater injection well—a right recognized and protected by the Supreme Court of Ohio. *State ex rel. AWMS Water Sols. v. Mertz*, 2020-Ohio-5482, ¶ 26, 162 Ohio St. 3d 400, 407, 165 N.E.3d 1167, 1177; *State ex rel. AWMS Water Sols., L.L.C. v. Mertz*, 2024-Ohio-200, ¶ 25, 174 Ohio St. 3d 401, 407, 237 N.E.3d 111, 118. Second, Arrowhead possesses a protected property interest in the continued operation of its existing business. *See Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611–12 (6th Cir. 2006).

140. Defendants deprived Arrowhead of those protected property interests by issuing the Suspension Order, immediately and indefinitely shutting down Arrowhead's only operating asset, acting under color of state law pursuant to O.R.C. 1509.03, O.R.C. 1509.224(B), and Ohio Admin. Code 1501:9-3-07(N).

141. The process afforded to Arrowhead before that deprivation was constitutionally inadequate. The Division's own communications prove it:

a. On October 5, 2026, the Division announced that it "intends to issue a suspension order"—before offering Arrowhead any process whatsoever and without identifying any factual or legal basis for that decision;

b. On October 8, 2026, the Division stated that it "plans to issue a suspension order by the end of the next week"—confirming that the decision had already been made before any process was offered;

c. When Arrowhead expressly requested "the factual and legal bases for the chief's decision," the Division responded with one sentence: "The Division has concerns about injected brine migrating out of the permitted injection zone and area of review"—a bare conclusion without any supporting facts, evidence, or legal authority;

d. The Division offered a Teams call on October 14, 2026, which lasted approximately eleven minutes, and during which it provided no further factual or legal basis for the suspension and afforded Arrowhead no meaningful opportunity to rebut any evidence; and

e. The Division confirmed that the order would issue regardless of whether Arrowhead attended the proposed meeting, telling Arrowhead it could defer deciding whether to meet "until the order is issued."

142. A meeting offered after the decision has been made, without disclosure of the evidence, without the right to present witnesses, without the right to cross-examine, and without neutral fact-finding is not a meaningful opportunity to be heard. The process afforded here—a predetermined suspension followed by an approximately eleven-minute call with no evidentiary rights—falls far short of what the Constitution requires.

143. The existing pre-suspension procedures under Ohio Admin. Code 1501:9-3-07(N) are themselves constitutionally inadequate, both facially and as applied, because they authorize the Chief to impose an immediate and indefinite suspension without providing the affected party

notice of the specific evidence against it, a meaningful opportunity to be heard before a neutral decisionmaker, or any defined evidentiary standard governing the Chief's determination.

144. Because the deprivation was deliberate and authorized—not random or unforeseeable—and meaningful pre-deprivation safeguards were practicable, delayed administrative review cannot excuse the failure to provide constitutionally adequate process beforehand. *Zinermon v. Burch*, 494 U.S. 113, 132–39 (1990). And even where immediate action is justified, due process requires a prompt and meaningful opportunity to contest the deprivation. *Barry v. Barchi*, 443 U.S. 55, 64–66 (1979). Defendants provided neither.

145. The Division had been investigating regional injection-well issues for months, communicated with Arrowhead over multiple days, established its own timetable, and prepared the Suspension Order in advance. It had ample time to disclose the evidence and provide a meaningful hearing before issuing the Suspension Order.

146. The Suspension Order further deprives Arrowhead of any procedural process as it fails to identify a clear path for Arrowhead to reinstate its Permit. It states that injection operations shall not resume until the Chief determines that the conditions that caused the suspension have been corrected. But the Chief's Order fails to identify what condition at the Well caused the asserted violations, what corrective action Arrowhead must take, or what objective standard it must satisfy to regain its authority to operate. Ohio Admin. Code 1501:9-3-07(O)(1) requires Arrowhead to submit a plan describing testing and corrective actions as a condition of reinstatement. Arrowhead cannot meaningfully formulate that plan when Defendants have not identified the conditions it must correct, the measures it must take, or the criteria governing reinstatement.

147. The consequences of this undefined standard are not abstract. Ohio Admin. Code

1501:9-3-07(P) requires Arrowhead to plug the Well if no corrective plan is submitted within 120 days of suspension or if an accepted plan is not timely completed. The scheme imposes fixed and potentially permanent consequences on Arrowhead while imposing no comparable deadline on Defendants to adjudicate whether the alleged conditions exist or are attributable to Arrowhead's Well. Arrowhead's prior experience with this administrative process confirms that meaningful review will not occur within that window. In a prior proceeding involving the same Well, fifty-five days elapsed before an informal hearing was held, another forty-one days elapsed before the Chief issued a decision, and ninety-six days elapsed before the prior preliminary order became final. Unlike that prior order, the Suspension Order is effective immediately and remains in effect throughout the entire process.

148. The absence of prompt review is not a practical necessity—it is a deliberate gap. Elsewhere in Chapter 1509, the General Assembly requires a meaningful opportunity to be heard and to present evidence within five days after certain immediately effective suspensions involving danger to public health, safety, or threatened damage to natural resources. O.R.C. 1509.04(D)(2). That provision confirms that prompt post-suspension review is both practicable and recognized by Ohio law as constitutionally necessary in analogous circumstances. The procedure applied to Arrowhead contains no comparable guarantee.

149. Arrowhead cannot cure a violation that has never been defined. The Division's failure to identify any actual migration, any condition at the Well that caused migration, or any new Arrowhead-specific evidence makes plain that the only apparent path to termination is for Arrowhead to operate at a lower pressure—which was the express purpose of the Revocation Order the Commission already found unlawful.

150. The Chief and Adgate have accomplished through the Suspension Order what the

Commission told them they could not accomplish through the Revocation Order, without providing Arrowhead any meaningful opportunity to be heard before doing so.

151. As a direct and proximate result of Defendants' ongoing deprivation of Arrowhead's procedural due process rights, Arrowhead has suffered and will continue to suffer irreparable harm, including the continuing deprivation of its constitutionally protected property interests.

**COUNT II – Violation of First Amendment Protections (Retaliation)**
**Under 42 U.S.C. § 1983**

152. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

153. The First Amendment to the United States Constitution guarantees the right of the people to petition the government for the redress of grievances, including the right to seek review of a government action before administrative tribunals and courts. *BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002).

154. A plaintiff demonstrates retaliation by showing that: (1) it engaged in protected speech or petitioning activity; (2) the defendant took an adverse action against it; and (3) there is a causal connection between the protected activity and the adverse action. *Josephson v. Ganzel*, 115 F.4th 771, 783 (6th Cir. 2024).

155. Arrowhead engaged in constitutionally protected petitioning activity by appealing the Chief's Revocation Order to the Commission in Appeal No. 1067, moving for judgment as a matter of law, presenting arguments to the Commission, and obtaining an order unanimously vacating the Chief's action. Arrowhead's appeal was not baseless—it prevailed. It is therefore squarely protected by the First Amendment.

156. Following Arrowhead's successful exercise of its First Amendment right to petition, Defendants took a series of adverse actions against Arrowhead, including: (i) dispatching

an inspector who had never previously inspected Arrowhead's injection-operations facility to issue Arrowhead's first-ever compliance notices for minor, technical conditions; (ii) denying retaliation and representing that no further action would be taken on the notices, without disclosing that the Division had already decided to suspend Arrowhead; (iii) days later, announcing the Chief's decision to suspend Arrowhead's operating license based on nothing more than a vague, unsubstantiated "concern"; (iv) meeting with Arrowhead for approximately eleven minutes, days before issuing the Suspension Order, and failing to provide Arrowhead any specific legal or factual basis for the inevitable Suspension Order or inform Arrowhead the suspension would be immediate; (v) issuing an immediately-effective "preliminary order" suspending Arrowhead's operations.

157. The immediate and indefinite suspension of an existing business built through an approximately $6 million investment would deter a person of ordinary firmness from petitioning the government for redress. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394–99 (6th Cir. 1999) (en banc); *Josephson v. Ganzel*, 115 F.4th 771, 787–89 (6th Cir. 2024). The ordinary-firmness test is objective—the question is not whether Arrowhead itself was deterred, but whether the actions taken would deter a reasonable person. The threat of losing an entire business as a consequence of successfully challenging a government order is precisely the kind of adverse action that would deter any reasonable person from exercising their constitutional rights.

158. The causal connection between Arrowhead's protected petitioning activity and Defendants' adverse actions is established by specific, nonconclusory allegations reasonably linking Arrowhead's appeal to the adverse actions taken against it. *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997).

159. Those allegations include:

a. Chief Vendel and the Division were each aware of Arrowhead's appeal before the Commission, its motion for judgment as a matter of law, and the Commission's unanimous decision vacating the Revocation Order on September 3, 2026;

b. On August 31, 2026—while the parties awaited the Commission's written decision—the Division dispatched an inspector who had never previously inspected Arrowhead's injection-operations facility, who issued Arrowhead's first-ever compliance notices for minor, technical conditions;

c. On October 5, 2026—five days after Arrowhead raised retaliation concerns—the Division announced that it intended to issue a suspension order against Arrowhead, without identifying any factual or legal basis for that decision;

d. On October 7, 2026, the Division's counsel denied retaliation without addressing the Chief's decision to issue a suspension order, which was communicated to Arrowhead just two days earlier;

e. When Arrowhead requested the factual and legal bases for the Chief's decision, the Division provided only a one-sentence statement of "concern" and identified no new Arrowhead-specific evidence arising after the Commission's ruling;

f. The Suspension Order pursues substantially the same practical result as the vacated Revocation Order—disabling Arrowhead's Well—using the same unrelated regional evidence the Commission had already found insufficient to support the Revocation Order; and

g. The Chief's decision to issue a "preliminary order" that was immediately effective, is, to Arrowhead's knowledge, unlike any suspension order the Chief has previously issued.

160. The timing, Defendants' knowledge, the reuse of evidence the Commission had already found insufficient, the absence of new Arrowhead-specific evidence, the departure from prior enforcement practice, and the indefinite nature of the suspension demonstrate that Arrowhead's protected petitioning activity was a substantial or motivating factor in Defendants' actions. Defendants would not have imposed an immediately effective and indefinite preliminary suspension on Arrowhead on the same terms and through the same process absent Arrowhead's protected petitioning activity.

161. The Suspension Order further demonstrates the Chief's intent to retaliate, as it fails to identify a clear path for Arrowhead to reinstate its Permit. It states that injection operations shall not resume until the Chief determines that the conditions that caused the suspension have been corrected. But the Chief's Order relies on the injection above the fracture closure pressure—the same factual foundation the Commission rejected as a basis for the Revocation Order—fails to identify the scientific basis for the fracture closure pressure and fails to provide any condition that is established as existing at the Well that could have caused the asserted violations. Furthermore, it fails to establish the corrective action Arrowhead must take, or what objective standard it must satisfy to regain its authority to operate. Arrowhead cannot cure a violation that has never been defined.

162. The Division's failure to identify any actual migration, any condition at the Well that caused migration, or any new Arrowhead-specific evidence makes plain that the only apparent path to termination is for Arrowhead to operate at a lower pressure—which was the express

purpose of the Revocation Order the Commission already found unlawful.

163. The Defendants aim to accomplish through the Suspension Order what the Commission told them they could not through the Revocation Order, and have acted with animus, violating Arrowhead's constitutional rights to prove a point: prevailing on an appeal before the Commission comes at a price.

164. As a direct and proximate result of Defendants' ongoing retaliatory actions, Arrowhead has suffered and will continue to suffer irreparable harm, including the continuing deprivation of its constitutional rights.

**COUNT III – Violation of Substantive Due Process**
**Under 42 U.S.C. § 1983**

165. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

166. The Fourteenth Amendment's substantive due process guarantee protects individuals from arbitrary and conscience-shocking government action, even when procedural protections are otherwise provided.

167. A defendant violates substantive due process under 42 U.S.C. § 1983, when: (1) the defendant deprived the plaintiff of a constitutionally protected liberty or property interest; (2) the defendant acted under color of state law; (3) through government conduct that is constitutionally repugnant—either intentionally injurious or so arbitrary as to shock the conscience.

168. As set forth above, Arrowhead possesses constitutionally protected property interests in its leasehold right to operate the Well and in the continued operation of its existing business. *State ex rel. AWMS Water Sols. v. Mertz*, 2020-Ohio-5482, ¶ 26; *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611–12 (6th Cir. 2006).

169. Defendants, acting under color of state law, deprived Arrowhead of those interests

by issuing the Suspension Order.

170. The Chief's conduct in issuing the Suspension Order shocks the conscience and is constitutionally repugnant for the following reasons:

a. The Commission had already found—unanimously—that the Chief acted unlawfully and without the necessary factual foundation when he previously attempted to revoke Arrowhead's permit based on speculation and an uncodified pressure standard. The Chief's response was to pursue the same practical result through a different mechanism, using the same regional evidence the Commission had already found insufficient;

b. Arrowhead has operated the Well for over four years without a single public-health, safety, or environmental incident. The Division has not identified evidence that Arrowhead's Well communicates with any production well, that Arrowhead's brine has left the permitted injection interval, or that any contaminant attributable to Arrowhead is present in groundwater within the Well's area of review;

c. The Suspension Order relies on the Redbird Report—which the Commission had already found concerned a well Arrowhead neither owned nor operated and did not mention Arrowhead's operations—and on the voluntary suspension of different wells operated by a different company, as the principal factual basis for immediately and indefinitely shutting down Arrowhead's only operating asset;

d. The Division announced its intention to suspend Arrowhead five days after Arrowhead raised retaliation concerns, denied retaliation without disclosing

that the suspension decision had already been made, and then issued the Suspension Order without identifying any new Arrowhead-specific evidence; and

e. The Chief issued the Suspension Order knowing that it would likely destroy Arrowhead's business, eliminate Ohio jobs, and disrupt Ohio oil-and-gas producers—based on nothing more than regional circumstantial evidence that the Commission had already found insufficient to support a less severe sanction.

171. The Chief issued the Suspension Order as an immediately effective preliminary order—a form of order that, to Arrowhead's knowledge, has never previously been used in this manner. Every comparable suspension order in the Division's recent enforcement history remained ineffective until finality, including orders based on directly observed contamination, failed mechanical-integrity demonstrations, and well-specific migration evidence. Arrowhead has been treated differently from every comparable regulated party, without any legitimate regulatory justification for that differential treatment.

172. In addition to the Chief's conduct, Adgate—who is part of the Division and is the signatory of the Suspension Order—approved a workover plan for the Nichols No. 1-A Well in 2014. Defendants are aware of that well's recent and historical casing problems—problems that could account for the regional production-well conditions the Chief claims are concerning. Yet, the Defendants issued the Suspension Order against Arrowhead while ignoring a more reasonable and obvious alternative explanation for the "concerning conditions," and instead, attribute the conditions to Arrowhead.

173. Lastly, the indefinite and standardless nature of the Suspension Order confirms that

it is not the product of legitimate regulatory judgment. Neither the Division, nor the Chief, has identified what condition at the Well caused the asserted migration, what Arrowhead must correct, or what objective standard it must satisfy to regain its authority to operate.

174. Arrowhead cannot cure a violation that has never been defined. The Division's failure to identify any actual migration, any condition at the Well that caused migration, or any new Arrowhead-specific evidence makes plain that the only apparent path to termination is for Arrowhead to operate at a lower pressure—which was the express purpose of the Revocation Order the Commission already found unlawful.

175. In their haste to accomplish that result through a different mechanism, the Defendants have imposed an indefinite shutdown on a business that has operated safely for over four years, without a single identified incident, without any Arrowhead-specific evidence, and without any meaningful process. Furthermore, for the first time ever, the Chief issued an immediately-effective "preliminary order."

176. Defendants aim to accomplish through the Suspension Order what the Commission told them they could not accomplish through the Revocation Order. It is the product of an agency that lost before the Commission and decided to punish the party that beat it. That is precisely the kind of arbitrary, conscience-shocking government action that the substantive due process guarantee is designed to prevent.

177. This claim is pleaded in addition to and in the alternative to Arrowhead's First Amendment retaliation claim. Even if Arrowhead's protected petitioning activity is not found to have substantially motivated the Suspension Order, Defendants' arbitrary deprivation of Arrowhead's protected interests independently violates substantive due process.

178. As a direct and proximate result of Defendants' ongoing violation of Arrowhead's

substantive due process rights, Arrowhead has suffered and will continue to suffer irreparable harm, including the continuing deprivation of its constitutionally protected property interests.

**COUNT IV – Violation of Equal Protection**
**Under 42 U.S.C. § 1983**

179. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

180. The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Arrowhead brings this claim as a "class of one," having been intentionally treated differently from similarly situated injection-well operators without rational basis and motivated by animus arising from Arrowhead's exercise of its constitutional right to petition the government.

181. Arrowhead is similarly situated in all material respects to the operators identified in Exhibit 14. Each owned and operated a permitted Class II disposal well, was subject to the same regulatory scheme and Ohio Admin. Code 1501:9-3-07(N), and received a preliminary order suspending injection operations.

182. Each comparable order expressly provided that it would not become effective until finality following the operator's opportunity to request an informal hearing. Arrowhead alone received a preliminary suspension order declared immediately effective upon issuance.

183. Many comparable orders rested on more particularized and serious grounds—failed mechanical-integrity demonstrations, directly observed releases of brine into the environment, multiple years of documented noncompliance, and an automatic shut-off device set above the permitted pressure. None of those orders were immediately effective.

184. K&H Partners LLC is an especially close comparator. The Chief issued Order No. 2023-139 under the same Rule (N) subsections invoked against Arrowhead and based it on the same general theory—that injected brine had migrated outside the permitted injection zone and

area of review and affected nearby production wells.

185. Unlike Arrowhead's Suspension Order, the K&H order identified affected production wells, documented brine flows and pressure increases at those wells, and described the geographic relationship between the injection wells and the affected production wells. The K&H order was not immediately effective.

186. Defendants intentionally treated Arrowhead differently. They knew of their uniform practice of issuing preliminary suspension orders that remained ineffective until finality but added materially different immediately-effective language to Arrowhead's Order.

187. No rational regulatory distinction justifies that difference in treatment. The proximity of Little Hocking's wells, the Redbird wells' voluntary suspension, injection into the same formation, and the estimated fracture-closure pressure do not explain why Arrowhead alone was denied the pre-effectiveness period afforded to every other similarly situated operator. The other orders in Ex. 14, and the K&H order in particular, involved more direct, particularized, and serious evidence of migration, contamination, or loss of mechanical integrity and were still not immediately effective.

188. The only material difference between Arrowhead and the similarly situated operators who received a preliminary order that was not immediately effective is that Arrowhead exercised its constitutional right to challenge the Chief's prior order before the Commission—and won. The timing, the reuse of evidence the Commission had already found insufficient, the absence of new Arrowhead-specific evidence, the departure from prior practice, and Defendants' knowledge of Arrowhead's successful appeal further demonstrate that the different treatment was motivated by animus directed at Arrowhead. *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461–63 (6th Cir. 2012); *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012).

189. As a direct and proximate result of Defendants' ongoing violation of Arrowhead's equal protection rights, Arrowhead has suffered and will continue to suffer irreparable harm, including the continuing deprivation of its constitutionally protected interests.

**COUNT V – Declaratory Judgment**
**Under 28 U.S.C. §§ 2201–2202**

**(Ohio Admin. Code 1501:9-3-07(N) Is Unconstitutional As Applied)**

190. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

191. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law violates due process when it fails to provide fair notice of the conduct it regulates or supplies no meaningful standards constraining enforcement. *Belle Maer Harbor v. Charter Township of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999). "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108–09.

192. A substantial, continuing, and immediate controversy exists between the parties concerning whether Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k), as applied to Arrowhead through Chief's Order No. 2026-278, violate the Due Process Clause of the Fourteenth Amendment.

193. Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k), as applied to Arrowhead through Chief's Order No. 2026-278, are unconstitutional because:

a. the terms "causing or is likely to cause," "likely to endanger," and "may be outside" were applied to Arrowhead without any ascertainable evidentiary or causal content—the Division's entire factual basis was a one-sentence statement of concern and regional circumstantial evidence concerning wells

that Arrowhead neither owned nor operated. That is not a standard—it is a blank check;

b. the Chief applied those provisions without identifying evidence particularized to Arrowhead's Well, a non-speculative connection between Arrowhead's operations and the asserted condition, or any particular violation of Chapter 1509 or Division 1501:9 attributable to Arrowhead;

c. the Division expressly authorized Arrowhead to operate at a MAIP of 990 psi, and neither Chapter 1509 nor Chapter 1501:9 identified estimated fracture-closure pressure as a separate operating limit or informed Arrowhead that operating within its authorized MAIP could support an immediate and indefinite suspension;

d. the Commission had already determined that the Chief's prior attempt to impose an uncodified fracture-closure-pressure standard conflicted with the governing MAIP regulation and could not be imposed without rulemaking, yet the Suspension Order relies again on that analysis and theory; and

e. the Suspension Order states that operations may not resume until the Chief determines that the conditions that caused the suspension have been corrected, but does not identify those conditions, the corrective measures Arrowhead must take, or the criteria governing reinstatement—leaving Arrowhead unable to determine what conduct it must alter, what condition it must correct, what evidence it must produce, or what standard it must satisfy to obtain termination of the Suspension Order.

194. The Commission has already recognized that the Chief's suspension authority

under sub-sections (N)(1)(a) and (N)(1)(f) offered a lawful path to act prospectively where a well is "likely to cause" contamination or "likely to endanger" public health or safety. But the Commission's recognition of that authority assumed it would be exercised with an Arrowhead-specific factual foundation. As applied here—where the Chief invokes that authority based on nothing more than regional proximity and a one-sentence concern—the provisions are unconstitutionally vague.

195. Defendants are enforcing Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k) against Arrowhead through Chief's Order No. 2026-278 and have stated their intention to continue doing so.

196. The Suspension Order places Arrowhead in the untenable position of either accepting the destruction of its business and the potential permanent physical impairment of the Well, or continuing to operate and risking further enforcement action, civil penalties, and liability under a purportedly strict-liability regulatory scheme.

197. A present declaration of the parties' rights, status, and legal relations will resolve this immediate and concrete controversy. Arrowhead has suffered and will continue to suffer harm—including destruction of its business, loss of customer relationships, loss of employment, physical harm to the Well, and disruption to third-party operations—if the Suspension Order is enforced.

198. Defendants' issuance of the Suspension Order and their intent to continue the enforcement thereof is an ongoing violation of Arrowhead's constitutional rights.

199. Arrowhead is entitled to a declaration that Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k) are unconstitutional as applied to Arrowhead through Chief's Order No. 2026-278.

## COUNT VI – Declaratory Judgment Under 28 U.S.C. §§ 2201–2202

**(Order No. 2026-278 Is Unconstitutional As Applied)**

200. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

201. A substantial, continuing, and immediate controversy exists between the parties regarding the constitutionality and enforceability of Chief's Order No. 2026-278.

202. Chief's Order No. 2026-278 is unconstitutional, void, and unenforceable because:

a. it deprives Arrowhead of constitutionally protected property interests without adequate notice and a meaningful opportunity to be heard, in violation of the procedural due process guarantee of the Fourteenth Amendment;

b. it deprives Arrowhead of constitutionally protected property interests through arbitrary, capricious, and conscience-shocking governmental conduct, in violation of the substantive due process guarantee of the Fourteenth Amendment;

c. it was issued and is being enforced in retaliation for Arrowhead's exercise of its First Amendment right to petition the government for the redress of grievances, in violation of the First Amendment as applied to the states through the Fourteenth Amendment;

d. it intentionally treats Arrowhead differently from similarly situated Class II disposal-well operators without rational basis and motivated by animus arising from Arrowhead's successful exercise of its constitutional right to petition the government, in violation of the Equal Protection Clause of the Fourteenth Amendment; and

e. it applies Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k) without fair notice or ascertainable enforcement and reinstatement standards, in violation of the Due Process Clause of the Fourteenth Amendment.

203. The procedural due process guarantee requires constitutionally adequate process before a deliberate and authorized deprivation of a protected property interest. Because meaningful pre-deprivation safeguards were practicable here, delayed administrative review cannot excuse the failure to provide them. *Zinermon v. Burch*, 494 U.S. 113, 132–39 (1990). The Defendants' failure to provide Arrowhead the process it was due is established by the Division's own communications.

204. On October 5, 2026, the Division announced that it "intends to issue a suspension order" before offering Arrowhead any process whatsoever. On October 8, 2026, it stated that it "plans to issue a suspension order by the end of the next week"—confirming the decision had already been made. When Arrowhead expressly requested the "factual and legal bases for the chief's decision," the Division responded with one sentence: "The Division has concerns about injected brine migrating out of the permitted injection zone and area of review." It identified no evidence, data, technical analysis, or legal provision supporting that conclusion. It then told Arrowhead it could defer deciding whether to meet "until the order is issued"—confirming that the meeting would not determine whether the order should issue.

205. A meeting offered after the decision has been made, without disclosure of the evidence, without the right to present witnesses and its own evidence, without the right to cross-examine, and without neutral fact-finding is not a meaningful opportunity to be heard.

206. Defendants are enforcing Chief's Order No. 2026-278 against Arrowhead and have stated their intention to continue doing so.

207. The Suspension Order places Arrowhead in the untenable position of either accepting the destruction of its business and the potential permanent physical impairment of the Well, or continuing to operate and risking further enforcement action, civil penalties, and liability under a purportedly strict-liability regulatory scheme.

208. A present declaration of the parties' rights, status, and legal relations will resolve this immediate and concrete controversy. Arrowhead has suffered and will continue to suffer harm—including destruction of its business, loss of customer relationships, loss of employment, physical harm to the Well, and disruption to third-party operations—if the Suspension Order is enforced.

209. Defendants' issuance of the Suspension Order and their intent to continue the enforcement thereof is an ongoing violation of Arrowhead's constitutional rights.

210. Arrowhead is entitled to a declaration that Chief's Order No. 2026-278 is unconstitutional, void, and unenforceable, and to an order setting it aside and prohibiting its enforcement or any reliance upon it to interfere with Arrowhead's authority to operate under Chief's Order No. 2022-100.

**COUNT VII – Declaratory Judgment**
**Under 28 U.S.C. §§ 2201–2202**

**(Ohio Admin. Code 1501:9-3-07(N) Is Facially Unconstitutional)**

211. Arrowhead restates the foregoing paragraphs as if fully rewritten herein.

212. A substantial, continuing, and immediate controversy exists between the parties concerning whether the statutory and regulatory framework governing immediate suspensions under Ohio Admin. Code 1501:9-3-07(N) provides constitutionally adequate procedures and sufficiently definite standards.

213. The combined statutory and regulatory framework is facially unconstitutional, in

the alternative, because:

a. Ohio Admin. Code 1501:9-3-07 was promulgated under statutory authority that includes O.R.C. 1509.22, and O.R.C. 1509.224(B) expressly governs orders enforcing rules adopted under that section, requiring a preliminary order stating the proposed action and findings, a meaningful opportunity to request an informal hearing and present evidence, and a subsequent decision to revoke, issue, or modify and issue the preliminary order as final;

b. O.R.C. 1509.03(D) separately authorizes the Chief to issue orders enforcing Chapter 1509, rules adopted under it, and permit terms, without prescribing hearing, timing, finality, or stay procedures;

c. if O.R.C. 1509.03(D) permits the Chief to bypass O.R.C. 1509.224(B), or if Ohio Admin. Code 1501:9-3-07(N) permits the Chief to make an order immediately effective while it remains preliminary under O.R.C. 1509.224(B), the combined scheme facially permits an immediate and indefinite deprivation of a constitutionally protected property interest without constitutionally adequate procedural safeguards—including no pre-deprivation hearing, no prompt post-deprivation hearing or decision, no automatic stay, no clearly guaranteed immediate access to neutral Commission review while an order remains preliminary, and no express deadline for the Commission to decide a stay request or resolve an appeal;

d. the scheme simultaneously imposes fixed and potentially permanent consequences on the operator—including mandatory plugging under Ohio Admin. Code 1501:9-3-07(P) if a corrective plan is not submitted within 120 days or an accepted plan is not timely completed—without imposing a comparable deadline for adjudicating

whether the alleged conditions exist or are attributable to the operator;

e. O.R.C. 1509.04(D)(2) confirms that a prompt five-day opportunity to be heard is practicable following certain immediately effective suspensions involving danger to public health or safety or threatened damage to natural resources, yet the challenged scheme contains no comparable guarantee; and

f. separately and in the alternative, subsections (N)(1)(a), (f), and (g) are facially vague because they authorize immediate and indefinite suspension without defining the necessary evidentiary threshold, the causal nexus to the particular well, the findings required concerning that well, the duration of suspension, or the criteria governing reinstatement—and subsection (N)(1)(k) is likewise facially deficient to the extent it permits immediate suspension based on an unspecified violation of any provision of Chapter 1509 or Division 1501:9 without requiring identification of the underlying violation.

214. Defendants are enforcing the statutory and regulatory framework against Arrowhead as though it is constitutional and have stated their intention to continue doing so.

215. The Suspension Order places Arrowhead in the untenable position of either accepting the destruction of its business and the potential permanent physical impairment of the Well, or continuing to operate and risking further enforcement action, civil penalties, and liability under a purportedly strict-liability regulatory scheme.

216. A present declaration of the parties' rights, status, and legal relations will resolve this immediate and concrete controversy. Arrowhead has suffered and will continue to suffer harm—including destruction of its business, loss of customer relationships, loss of employment, physical harm to the Well, and disruption to third-party operations—if the Suspension Order is

enforced.

217. Defendants' issuance of the Suspension Order and their intent to continue the enforcement thereof under Ohio Admin. Code 1501:9-3-07(N) is an ongoing violation of Arrowhead's constitutional rights, and any future enforcement under that Code provision is unconstitutional if it either permits the Chief to make an order immediately effective by being issued under either O.R.C. 1509.03(D) and/or as a preliminary under O.R.C. 1509.224(B), or, alternatively, because it is void for vagueness.

218. Arrowhead is entitled to a declaration that:

a. if Ohio Admin. Code 1501:9-3-07(N) permits the Chief to make an order immediately effective by being issued under either O.R.C. 1509.03(D) and/or as a preliminary under O.R.C. 1509.224(B), Ohio Admin. Code 1501:9-3-07(N) is facially unconstitutional under the Due Process Clause of the Fourteenth Amendment; and

b. in the alternative, Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and, to the extent alleged above, (k), are facially void for vagueness under the Due Process Clause of the Fourteenth Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, in consideration that the foregoing constitutes violations of Arrowhead's rights as guaranteed by the United States Constitution, Arrowhead seeks:

A) A preliminary injunction, pursuant to Fed. R. Civ. P. 65 and 28 U.S.C. § 2202, prohibiting Defendants from:

i. Enforcing or giving effect to Chief's Order No. 2026-278;

ii. Suspending, revoking, or otherwise interfering with Arrowhead's authority to

operate the Well under Chief's Order No. 2022-100 pending a final decision on the merits of this action;

iii. Taking any further adverse action against Arrowhead in connection with the compliance notices issued following the Commission's September 3, 2026 order vacating the Revocation Order; and

iv. Issuing, enforcing, or giving effect to any suspension order, revocation order, or other enforcement order against Arrowhead that is not grounded in a specific, articulable, Arrowhead-specific factual foundation, supported by competent evidence, and issued only after affording Arrowhead adequate notice and a meaningful opportunity to be heard;

B) Restore the status quo existing immediately before Chief's Order No. 2026-278 became effective, without preventing otherwise lawful, nonretaliatory emergency action based on materially new and particularized Arrowhead-specific evidence and accompanied by the process constitutionally required under the circumstances;

C) A declaration stating that:

i. Chief's Order No. 2026-278 was issued and is being enforced in retaliation for Arrowhead's protected petitioning activity, in violation of the First and Fourteenth Amendments to the United States Constitution;

ii. Chief's Order No. 2026-278 deprives Arrowhead of protected property without constitutionally adequate notice and a meaningful opportunity to be heard, in violation of the Fourteenth Amendment to the United States Constitution;

iii. Chief's Order No. 2026-278 deprives Arrowhead of protected property

through arbitrary and conscience-shocking government conduct, in violation of the substantive due process guarantee of the Fourteenth Amendment;

iv. Chief's Order No. 2026-278 subjects Arrowhead to disparate treatment without rational basis and motivated by animus, in violation of the Equal Protection Clause of the Fourteenth Amendment;

v. Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k) are unconstitutionally vague, both facially and as applied to Arrowhead under the facts of this case;

vi. if Ohio Admin. Code 1501:9-3-07(N) permits the Chief to make an order immediately effective by being issued under either O.R.C. 1509.03(D) and/or as a preliminary under O.R.C. 1509.224(B), Ohio Admin. Code 1501:9-3-07(N) is facially unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

vii. in the alternative, Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and, to the extent alleged above, (k), are facially void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

viii. Chief's Order No. 2026-278 is unconstitutional, void, and unenforceable; and

ix. Defendants may not enforce Chief's Order No. 2026-278 or rely upon it to interfere with Arrowhead's operations;

D) An order setting aside and vacating the Suspension Order as unconstitutional, void, and

without legal force or effect;

E) An injunction permanently prohibiting Defendants from:

i. Enforcing the Suspension Order;

ii. Issuing or enforcing any order against Arrowhead suspending, revoking, limiting, or otherwise interfering with Arrowhead's operating permit or the operations of the Well unless and until Defendants have: (a) identified particularized Arrowhead-specific facts and evidence demonstrating that Arrowhead's operations are causing or have caused a violation of Ohio law or a cognizable threat to public health, safety, or the environment; (b) provided Arrowhead with adequate written notice of the specific grounds for any proposed action, including all evidence and data upon which Defendants intend to rely; (c) afforded Arrowhead a meaningful opportunity to review and respond to that evidence, present relevant evidence concerning causation, alternative sources, operating conditions, and corrective measures, before any order is issued; and (d) issued a reasonably prompt decision identifying the grounds for the action and, if operations are suspended, the conditions and objective criteria governing reinstatement;

iii. Taking any adverse action against Arrowhead that is motivated, in whole or in part, by Arrowhead's exercise of its constitutional right to petition the government for the redress of grievances, including but not limited to appealing orders of the Chief to the Commission or to any court; and

iv. Enforcing Ohio Admin. Code 1501:9-3-07(N)(1)(a), (f), (g), and (k) against Arrowhead without the following: (a) written notice identifying the

particularized Arrowhead-specific facts and evidence supporting the proposed action; (b) a meaningful opportunity for Arrowhead to review and respond to that evidence; (c) a meaningful opportunity for Arrowhead to present relevant evidence concerning causation, alternative sources, operating conditions, corrective measures, and the existence or absence of a threat to public health, safety, or the environment; and (d) a reasonably prompt decision identifying the grounds for the action and, if operations are suspended, the conditions and objective criteria governing reinstatement;

F) Attorney's fees (including expert fees) and costs pursuant to 42 U.S.C. § 1988; and

G) Any other declarative, injunctive, or equitable relief this Court deems just and appropriate.

Respectfully submitted,

VORYS, SATER, SEYMOUR AND PEASE LLP

/s/ Thomas H. Fusonie
Gregory D. Russell (0059718)
Thomas H. Fusonie, Trial Attorney (0074201)
Christopher J. Belmarez (0101433)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Phone: (614) 464-6400
Fax: (614) 719-4900
E-mail: gdrussell@vorys.com
thfusonie@vorys.com
cjbelmarez@vorys.com

*Counsel for Plaintiff Arrowhead Road Services, LLC.*

# VERIFICATION

I, Larry J. Cavallo, being of full age, hereby certify as follows:

1. I am the operations manager of the Arrowhead Road Services #1 (SWIW #27) Well owned by Plaintiff Arrowhead Road Services, LLC ("Arrowhead") and have been authorized by Arrowhead to make this verification on its behalf.

2. I have read the foregoing Verified Complaint, and the facts stated therein are true and correct to the best of my knowledge, information, and belief, based on information available to me.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2026.

Larry J. Cavallo

Larry J. Cavallo